Rex Lamont Butler
745 W. 4th Ave., Suite 300
Anchorage, Alaska, 99501
(907)272-1497
rexbutlercalendar@gmail.com
Attorneys for Joshua Wahl

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>PLAINTIFF, )<br>V. )<br>)<br>JOSHUA WAHL, )<br>DEFENDANT. )<br>_____) | 3:23-CR-00087-SLG-MMS |

**MOTION TO SUPPRESS AND EXCLUDE ALL EVIDENCE ACQUIRED FROM THE ILLEGAL SEIZURE AND SEARCH OF DEFENDANT BY THE STATE OF ALASKA INCLUDING THE FRUITS THEREOF.**

**FACTS, IN RELEVANT PART**

The state of Alaska charged Joshua Wahl (Wahl) with six (6) counts of Unclassified Felony Murder in case State of Alaska v. Joshua Wahl 3DI-23-00202 CR. The charges stemmed from a report Wahl made on August 19th, 2023.

On August 19th, 2023, Wahl called the Dillingham police and reported that he had found two of his friends dead. He waited for the police outside the murdered friends'

residence.[1] [starting at 0:02:55]. A female Officer (O'Malley) arrived in a Ford SUV marked Dillingham Police with plate number XZA854 and walked towards a male trooper standing next to a car marked Alaska State Troopers. Officer O'Malley pointed with her finger and said it is this house here and said, I should have backed up a little bit more. [0:02:55 - 0:03:29].

The Trooper walked towards a house and said, "Josh just show me your hands". [0:03:29-0:03:51]. Wahl walked towards the trooper and Officer O'Malley with his hands up in the air and said I came back here for my shit and there are two corpses. There are two dead bodies. Officer O'Malley asked it is Jennifer and who? Wahl said and her boyfriend. Wahl said, I do not know what is going on, look I am not armed and then reaches into the pocket of the top (jumper) and pulls out two items. [0:03:51-0:04:11]. The trooper said to Wahl, hey man you do not pull anything out of your pocket I am just going to pat you down then said turn around and he proceeds to do a pat-down on Wahl. [0:04:05 -0:04:14].

Wahls said to the officers I came here to get my stuff from last night. When I left this morning, there were no corpses. Ask Ashley Nakwuk, when she left too, there were no dead bodies. [0:04:14 -0:04:27]. The trooper continued pat searching Wahl who had his hands raised in the air and then said to Wahl, I see you pulled out a holster here where is your pistol? Wahl said, "I don't know. The trooper then said, "You don't know". Wahl responded, "It is at my house. It is a 10 millimeter". "I didn't bring my gun last night". The

---

[1] These facts are gathered from video file 2033_0819_102020H106290_TKOOD9_001 (As marked on video).

male Trooper asked, what is it (the holster) in your pocket for then? Wahl said that I had it last night but my 10 millimeter is at my house. [0:04:27- 0:04:45].

The Trooper said to Wahl, hey can you do us a favor. Can we have you sit in Officer O'Malley's car **for a second**, we are not going to put you in cuffs I already patted you down. We are going to go inside and make sure everything is okay. Wahl said again that there are two corpses in there. Officer O'Malley said it is just going to be a minute Josh. With her keys in hand, Officer O'Malley led Wahl to her car. [0:04:40-0:04:58].

At her police car, Officer O'Malley opened the driver's door, unlocked the back passenger door directly behind the driver's seat, then opened the door and said to Wahl, Josh it is just going to be a minute, **I will not leave you in here long**. After Wahl got into the car, Officer O'Malley, said **I will be right back** and then shut the passenger door. She opened the driver's door and **pressed the button to lock the car doors** and then walked back to the house. [0:04:58 – 0:05:38].

As Officer O'Malley walked towards the house; the trooper was standing at Wahl's white pickup truck between the open driver's door and the driver's seat facing the inside of the truck with **his head and part of his body partially inside the truck** but walked away from the driver's seat upon seeing Officer O'Malley. [0:05:38 – 0:06:01]. The trooper said to Officer O'Malley, he already has a holster. In response, Officer O'Malley said I am sure the gun is somewhere. As Officer O'Malley walked into the house, a bloody shoes print can be seen at the second step leading into the house and more bloody shoe prints can be seen at the entry way. 0:06:00 – 0:06:20].

3

Leading the way into the house, the trooper stepped on the bloody footprints in the hallway. Inside the hallway past the wooded floor and at the start of floor tiles, bloody toe prints and barefoot bloody prints can be seen. In what appears to be a kitchen, there is a sink with water running and a microwave thrown on its side in the middle of the floor. The Trooper says there is a closed door that he needs to clear to make sure there is no one in there and asks Officer O'Malley to clear the other room. The trooper said that they need to figure out where Wahl walked. [0:06:20 – 0:08:16].

The trooper says this is weird, there is blood everywhere and two (2) dead people. Officer O'Malley said that I don't see a weapon anywhere and we do not know where Josh's gun is. While standing over the two decedents, the trooper asked Officer O'Malley if she knew who they were. Officer O'Malley said that she did not know them. The trooper said he was going to reach into the male decedent's wallet, and he did take an ID from the wallet and identified the decedent as Timothy Evans. Officer O'Malley called in the identification over the radio while **the trooper may have continued searching the wallet**. Officer O'Malley placed the palm of her right hand over her camera. [0:08:16 – 0:12:28]. The trooper and Officer O'Malley both got on their phones and placed calls then walked outside the house.

While outside, Officer O'Malley said I am going to start taking photos. The Trooper said to Officer O'Malley, we wanna interview Josh and see when he came here, why he came here, why he was here last night. Officer O'Malley said, ya okay. The trooper said that we need to get photos of his shoes too. Officer O' Malley started taking photos starting from outside at the entry of the house then continued inside. [0:13:00 – 0:13:30].

While Officer O'Malley was taking photos inside, the trooper said let me go talk to Josh though. Officer O'Malley said we do need to.[2] [0:00:040 – 0:01:08]. Officer O'Malley continued taking photos and walked outside, **for the second time**, the trooper was standing at the driver side of Wahl's white truck looking at a phone in the truck. The trooper said to Officer O'Malley that the phone had just received a text message, **the trooper then reached for the phone, tilted it and** then read the message before saying to Officer O'Malley that it is in plain view because it is on his locked screen. Officer O'Malley said we should probably just seize the phone. The trooper said probably. [0:01:08 – 0:01:51]. Officer O'Malley appears to take a photo of Wahl's phone screen with the text then continued taking photos of the inside of the car and walked to the passenger side door, opened it and took more photos. While taking photos Officer O'Malley dug through Wahl's vehicle and said I do not see Josh's gun here. [0:01:51- 0:03:54].

Officer O'Malley walked to her car and unlocked the driver's door using her car keys and said are you okay Josh. Wahl, said I have proof I was not here. Officer O'Malley said to Wahl, so that is what I want to talk to you about. When is the last time you saw these guys? Wahl said about 8:00 or 9:00 a:m when I woke up they were alive. I have proof because I walked home in my socks and my socks aren't pink. My socks would have stepped in blood. I have proof because I came back to get my socks and my other stuff that I left here last night. When I came back I thought they were joking at first so I stepped over them so I thought they were just kidding then I realized the pile of blood. I have two socks

---

[2] These facts are gathered from video file 2033_0819_102020H106290_TKOOD9_002 (As marked on video)

that aren't pink I have been wearing them since morning. If I had stepped in blood they would have blood on them. Officer O'Malley said so you saw them at 8:00 or 9:00 this morning. Wahl said and Ashley Nakwak did too. Officer O'Malley asked, did you stay the night here last night? Wahl said yes. Officer O'Malley asked do you know that other person? Wahl said Ashley Nakwak but I don't think she killed them. [0:03:54 – 0:05:32]. Wahl said that when he woke up they were alive. He said he walked home in his socks and they are not pink. If he had stepped in blood his socks would have been pink. Wahl said he got into a fight with his girlfriend because he left the night before. Walh said he returned to get his boots and shoes that is when he saw the two corpses. [ 0:05:32 - 0:07:40].

      Office O'Malley said to Wahl, Josh can I take a photo of the bottom of your shoes? Wahl asked, can I get out? Officer O'Malley said I am just gonna keep you here for a little bit is that okay? Wahl said yes and added that the shoes were here the whole time. I just put them on. Officer O'Malley asked Wahl what shoes he was wearing last night. Wahl said that I was wearing tennis shoes. Officer O'Malley asked what color are they? Wahl said white and then said **can I go pee please?** [0:08:45 – 0:09:50]. Officer O'Malley's response was bear with me Josh. Wahl said he was on some medication and he needed to go pee. Officer O'Malley asked where the shoes are he wore this morning when she saw him. Wahl said the shoes were in his truck and that he just wore the boots he has on. Wahl said that he left the boots at the house last night. [0:09:50 – 0:10:30].

      Officer O'Malley asked Wahl to take off one of his boots. Officer O'Malley proceeded to unlock the door and then walked to the passenger door and opened it then took the boot from Wahl who said there was no blood on it. Officer O'Malley took the boot

6

looked at it and agreed with Wahl. Officer O'Malley said to Wahl do you mind taking the other one off for me Josh? Wahl said, you gonna open the door for me to do it. Officer O'Malley said that this one might be enough for right now and she said hang on one second, I will be right back okay? Wahl said something and Officer O'Malley said I believe you I just have to work out what is happening here. Obviously, it is a big situation. She then said to Wahl we are trying to figure it out. [0:10:30 – 0:12:15].

Officer O'Malley walked back to the house and told the Trooper that she was looking for a pair of Tennis shoes. There is no blood on those boots. Officer O'Malley asked to look at the photos of the sole of Wahl's boots and compared them to the bloody shoe print and agreed with the Trooper that it did not match.[3] [0:00:00- 0:03:36].

Officer O'Malley said that Wahl is a suspect and agitated, and that she does not know if he is going to go shoot some more people. She said, I don't know how safe it is to have him out of custody right now. I would say that it is not safe. And that text indicates, if his girlfriend said she is gonna break up with him that is the end for him. [0:03:30 – 0:04:59]. Officer O'Malley said I am going to keep him in custody. His girlfriend just broke up with him. [0:05:00-0:09:50].

"I have got Josh Wahl in the back of my car. We are gonna go ahead and transport him and keep him detained as a suspect right now." [2023_0819_112020H106290, TKO0D-005 starting at 0:09:00 to 0:09:50]. As soon as I get Josh settled in, I will come back here. [0:09:50 to 0:11:00]. I am just gonna let him pee and get handcuffs on him.

---

[3] These facts are gathered from video file 2033_0819_102020H106290_TKOOD9_003 (As marked on video)

[2023_0819_113520H106290, TKO0D-006 starting at 0:02:00- 0:02:50]. Trooper says, we will take him there, get him situated, put him in one of the rooms get him lunch and let him cry it out. [0:12:00 to 0:12:30].

Wahl was arrested, remanded in jail. As part of the investigation, the state searched a Wahls' car and found lasers and also used information learned during Wahl's seizure to secure search warrants that led to the discovery of ammunition that included 10 mm rounds.

Subsequent to being arrested and charged by the state, Wahl was indicted by the federal government on five (5) counts. Count 1: Cyberstalking in violation of 18 U.S.C. §2261A (2) and Counts 2-5 Transmitting threats in interstate commerce in violation of 18 U.S.C. § 875(c). Among other allegations, the federal government alleged that Wahl sent Michael Chitwood, the Sheriff of Volusia County Florida an email threatening to injure and kill him. The federal government alleged that in the email, Wahl stated that he was armed with lasers and explosives, and included links to video from Wahl's YouTube account showing Wahl utilizing a laser to burn a hole in a photograph of Chitwood, specifically in Chitwood's face, and holding apparent explosives in front of a photograph of Chitwood.

The indictment also asserted that Wahl posted online for Chitwood to be shot in the head with overpressure 10 mm round.

The federal government included information and evidence gathered by the state in the discovery made to Wahl's attorney. Wahl believes that, the evidence acquired from the state as a result of what he believes was an illegal seizure and search will be used in the federal government's case against.

**II**

LAW AND ARGUMENT

A

**THE GOVERNMENT SHOULD BE BARRED FROM INTRODUCING EVIDENCE ACQUIRED THROUGH THE STATE OF ALASKA BECAUSE THE STATE ARRESTED WAHL WITHOUT PROBABLE CAUSE THUS THE EVIDENCE DISCOVERED AS A RESULT OF THE ARREST AND SUBSEQUENT SEARCH IS THE FRUIT ON ILLEGAL SEIZURE AND SEARCH BY THE STATE.**

The government may not successfully assert that the illegal act was done by state or local officers and therefore the statements subsequently taken are admissible in federal prosecution without concern as to the method by which they were obtained. Elkins v. United States, 364 U.S. 206 (1960) and United States v. Hall, 488 F.2d 193, 195 (9th Cir. 1973). Evidence obtained as a result of an illegal arrest must be suppressed. Wong Sun v. United States, 371 U.S. 471 (1963). It settled that evidence seized during an unlawful search cannot constitute proof against the victim of the search. United States v. Crews, 502 F.3d 1130, 1135 (9th Cir. 2007). The exclusionary rule extends not just to evidence seized during an unlawful search, but also to indirect products of such invasions. Wong Sun, at 484. An egregious Fourth Amendment violation warrants suppression even if the evidence is highly reliable and probative. Orhoraghe v. INS, 38 F.3d 488, 502 (9th Cir. 1994).

The Federal constitution by virtue of the Fourteenth Amendment prohibits unreasonable searches and seizures by state officers. The Security of one's privacy against arbitrary intrusion by the police is implicit in the concept of ordered liberty and as such enforceable against the states through the Due Process Clause. Wolf v. Colorado, 338 U.S. 25, 27-28. No distinction can logically be drawn between evidence obtained in violation

of the Fourth Amendment and that obtained in violation of the Fourteenth Amendment. The Constitution is flouted either way. Elkin, 364 U.S. 206, 215 (1960).

The Fourth Amendment safeguards the privacy and security of individuals against arbitrary invasion by governmental officials. Carpenter v. United States, 589 U.S 138 (2018). Article I, Section 22 guarantees a right of privacy, while Article I, Section 14 prohibits unreasonable searches and seizures. Article I, Section 1 of our state constitution declares that "all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry". In Breese v. Smith, 501 P.2d 159, 168-172 (Alaska 1972), the Alaska Supreme Court interpreted this provision as guaranteeing a certain level of personal autonomy, and as creating a sphere of personal activities and choices that are presumptively immune from government interference or regulation.

If the police take a person into custody and transport the person to another site for interrogation or other investigation, the police must normally have probable cause. For example, in Davis v. Mississippi, 394 U.S. 721 (1969) the defendant and twenty-three other suspects were detained for interrogation and fingerprinting at a police station following a sexual assault that had occurred days before. Id., at 722-23 . The Supreme Court held that the defendant's fingerprints should have been excluded as fruit of the poisonous tree from the officers' violation of the Fourth Amendment in failing to have probable cause for such an arrest. Id., at 726-27. In Dunaway v. New York, 442 U.S. 200 (1979) the police took a suspect into custody at his home and then brought him to a police

station for questioning. New York argued that *Terry* should be extended to allow police to briefly bring a suspect to a police station for questioning (a relatively lesser-intrusive seizure) based on a lesser quantum of evidence than would normally be required for a full arrest. Id., at 211-12. But the Court rejected this argument, recognizing the difficulty in distinguishing between such detentions and actual arrests: "[T]he detention of petitioner was in important respects indistinguishable from a traditional arrest. Petitioner was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room." Id., at 212. Because the police did not have probable cause to arrest the defendant in *Dunaway,* the Court held that his Fourth Amendment rights had been violated and excluded his resulting confession. Id., at 218-19. Requiring probable cause before police take a suspect into custody was affirmed in Kaupp v. Texas. 538 U.S. 626 (2003). In Kaupp, the Court found that "involuntary transport to a police station for questioning is 'sufficiently like arres[t] to invoke the traditional rule that arrests may constitutionally be made only on probable cause.'" Hayes v. Florida, 470 U.S. 811, 816 (1985)). "Taking of the suspect to the police station in lieu of conducting the investigation at the scene will ordinarily take the police conduct outside the *Terry* rule." Wayne R. LaFave, et al., Criminal Procedure § 3.8(b), at 310 (3d ed. 2007).

Probable cause to arrest exists if the facts and circumstances known to the officer would support a reasonable belief that an offense has been or is being committed by the suspect. State v. Joubert, 20 P.3d 1115, 1118-19 (Alaska 2001).

In his treatise, *Search and Seizure*, LaFave endorses the limits that the ALI Model Code of Pre-Arraignment Procedure places on the detention of witnesses. He contends that the Fourth Amendment does not allow potential witnesses to be stopped to the same extent as those suspected of crimes.[4]  City of Kodiak v. Samaniego,83 P.3d 1077,1083 (Alaska 2004).

In Brown v. Illinois, 422 US 590 (1975), police officers investigating a homicide had been informed that the defendant was an acquaintance of the victim. On this information, and this information only, the officers broke into defendant's apartment, searched it, and arrested the defendant at gunpoint. The Supreme Court concluded that defendant's subsequent confessions should have been suppressed because the confessions were obtained as a result of an illegal arrest. The court noted that the officers were aware that they lacked a sufficient predicate for the arrest. The arrest was "investigatory" and was an "expedition for evidence in the hope that something might turn up." (Brown, at 605)

Like Brown, Wahl was arrested after he was searched, detained and accused of a crime by law enforcement without a scintilla of evidence. The officers knew that they lacked the necessary predicate for an arrest. Officer O'Malley made the decision to arrest Wahl in an expedition for evidence and hoped that something might turn up. The officers lacked reasonable trustworthy information sufficient to cause a reasonable man to believe that Wahl committed the murders. All the officers saw was the empty pistol holster that

---

[4] 4 WAYNE LAFAVE, SEARCH & SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.2(b) (3d ed. 1996).

Wahl had. There was no blood on his shoes. There was no evidence of a correlation between the size of the bloody shoe print at the scene and Wahl's shoe size. There was no evidence of gunshot residue on Wahl's hands. No witness pointed a finger at Wahl and the officers did not find anything on the scene that would have reasonably caused them to believe that Wahl had committed the murders.

The officer's decision to transport Wahl to the police station only further aggravated the violation of his constitutional right to be free from illegal searches and seizures. Wahl was not questioned and detained briefly in the place he was found, but he was transported to a police station and was placed in a cell. Law enforcement transported Wahl to the police station after he submitted to their authority. Transporting Wahl to the police station only affirmed that this was not an investigatory stop but a full-blown arrest. This fact is evident in Officer O'Malley statement to the effect that Wahl was under arrest. Officer O'Malley had no evidence whatsoever that Wahl had committed a crime.

**B**

**ALL EVIDENCE DISCOVERED IN WAHL'S PHONE AND VEHICLE SHOULD BE SUPPRESSED BECAUSE IT RESULTED FROM AN ILLEGAL WARRANTLESS ARREST AND SEARCH.**

For the plain view exception to apply, the item in question must be clearly visible, and the officer may not manipulate or disturb it in order to acquire probable cause to believe the item is evidence of a crime. In Arizona v. Hicks, 480 U. S. 321 (1987). The plain view doctrine is not applicable where the object must be moved or manipulated before its

13

illegality can be determined. Hicks, 328. *see also* Minnesota v Dickerson, 508 U.S. 366, 378-379. The movement or manipulation of an object from its original state in a manner that goes beyond the objectives of the original search constitutes an independent search or seizure. Id. Such a search or seizure may not be upheld without proof that the officer who moved or manipulated the object had probable cause to believe that the object was evidence or contraband at the time that it was moved or manipulated. Hicks, at 326, 328.

A search occurs when the incriminating quality of the item subsequently seized was readily apparent and required **no movement** of either the observer or the observed object to detect. Anderson v. State, 555 P.2d 251,257 (Alaska 1976).

Here, any incriminating nature of the evidence contained on the phone was not immediately apparent because police had to manipulate the phone before viewing the text message on it. The officer did **not** have probable cause to believe that the phone or text message were connected to criminal activity without viewing their contents. Therefore, the officer illegally searched and seized the phone. Consequently, all evidence from the search and seizure of the phone should be suppressed.

Also, the officers had no right or legal basis for searching Wahl's vehicle. All evidence including the laser discovered in the track should be suppressed. The suppressions should extend to all evidence that would not have been discovered but for the illegal seizure of Wahl by the state officers, even though that were the product of a search warrant issued in any part based on information learned from the illegal seizure.

**CONCLUSION**

This court should exclude any evidence that resulted from the state's illegal seizure and search of Wahl. The exclusionary rule is calculated to prevent, not repair. Its purpose is to deter. To compel respect for the constitutional guaranty in the only effectively available way by removing the incentive to disregard it. Elkin, at 364, at 217. Admitting the unlawfully seized evidence will only serve to defeat the purpose of the federal (and state) constitution.

DATED this 24th day of July 2024.

/s/ Rex L. Butler
REX LAMONT BUTLER

ATTORNEY FOR JOSHUA WAHL

Certificate of Service
I hereby certify that this motion was served upon the United States through AUSA Seth M. Beausang through ECF filing on 7/24/24.

/s/Rex L. Butler
Rex Lamont Butler